This is a "direct access” suit on a contract claim, as authorized by 41 U.S.C. §609 (Supp. II 1978, 92 Stat. 2388), brought within one year of a contracting officer’s adverse decision. Defendant moves for summary judgment and plaintiff makes no response. Defendant supports its motion with an Inspector General’s report prepared for another purpose, but containing all the relevant facts for our purposes. We think in the circumstances, neither party can complain if we assume the Inspector General’s interviewees made truthful statements and the investigators reported them correctly, permitting a speedy and inexpensive disposition of this unfortunate "who-struck-John” case. Defendant admits its liability in the amount of $310, but we think it is liable in the amount of $600 and so decide.
In July 1979 Mr. Robert Hooper, being then an attorney-adviser for the Pesticides and Toxic Substances Enforcement Division of the Environmental Protection Agency (EPA) doubled in brass as producer of a training film for his division. He had formerly engaged in a business called *719 "Hooper Productions” and still maintained a bank account in that name, which was, however, just a personal account, as the business was inactive. He requested and received authorization to employ a motion picture cameraman for not over 16 man-days at an approximate cost to include daily salary of $200, per diem of $35 and an "average aire [sic] transportation cost of $300 per location.” He solicited oral proposals and selected plaintiff, Mr. Mannix, who asked $200 per day. Two other bidders proposed $500 and $450 per day, respectively. It is not disputed that Mr. Mannix was a qualified movie cameraman, nor that he owned and could provide the necessary equipment. It is not disputed that the contract of employment was not confirmed by a writing and the record reflects that it was not usual to do so when a cameraman was employed for a government training film.
On July 23, 1979, Mr. Mannix showed up "on location” at Warrenton, Virginia, with his equipment and accompanied by a crew consisting of sound and lighting technicians, thus a team of three in all including Mr. Mannix. The day before, however, Mr. Hooper had told him that Mr. Hooper’s "roommate” a Mr. Moyround, would do the sound.
After the day’s shooting, a discussion arose as to the next day’s program and Mr. Hooper learned for the first time that Mr. Mannix did not mean to pay his sound and light technicians out of his $200 "salary” but rather intended, as he said union rules required, that their pay, subsistence, and travel, was for government account. The discussion ended with Mr. Hooper "terminating” the contract then and there, writing Mr. Mannix a check on his "Hooper Productions” account in the amount of $600. Mr. Mannix left with Mr. Hooper the film shot that day, and other cameramen completed the training film.
The next day Mr. Hooper stopped payment on the check, being assured by agency procurement officials that they would settle with Mr. Mannix, using government funds. Mr. Mannix, however, preferred conflict of interest charges against Mr. Hooper, precipitating an investigation by the Inspector General, and delaying settlement of the claim. Eventually the EPA figured Mr. Mannix was entitled to *720 $310, being one day’s "salary,” and mailed him a check for that amount, which he refused to accept.
All the statements taken by the Inspector General confirm that it was an honest misunderstanding. If more experienced with this kind of work, Mr. Hooper would have known that for such government training films, a cameraman’s pay was not for his technicians, whom he recruited but the government paid, or at least would have anticipated that Mr. Mannix might expect this. See statements by Philip Younger of plaintiffs union and Donnell Mantkes of the EPA, Office of General Counsel, as well as, of course, Mr. Mannix himself. The wide discrepancy between the contract proposals of other bidders at $500 and $450 a day, and Mr. Mannix, at $200, should have put Mr. Hooper on inquiry as to whether they all had the same understanding as to responsibility for pay of supporting technicians.
The EPA procurement officials characterized Mr. Hooper’s payment of $600 of personal funds as a "compromise” he was not authorized to make. There is nothing in the Inspector General’s statements to suggest that either Mr. Hooper or Mr. Mannix thought it was a compromise. Rather it looks like payment in full on Mr. Mannix’s theory. Under such a "requirement” type of contract, neither party could have expected any liability to accrue on account of further work not actually ordered. This was Mr. Hooper’s assessment of the liability he had created, before settlement was taken out of his hands by persons not as close as he had been to the original making of the contract. The record offers no explanation of why originally he paid out of personal funds, except that he did it to get possession of the film shot that day, nor do we have to determine this in order to discover the true significance of his choice of an amount to pay. It looks as if he realized that Mr. Mannix’s appearance at the location with two assistants was an error to which his own contribution had been too large to justify throwing all the cost of it on Mr. Mannix. On the other hand, Mr. Mannix’s acceptance of $600 would seem to estop him from claiming more at a later date.
Therefore, we determine that Mr. Mannix was justified in interpreting his contract as entitling him to $600 that day, to cover assistant hire, travel, subsistence, etc. We also *721 determine that it would be inequitable for plaintiff to claim over $600, or for defendant to pay less, and the contract is therefore reformed to provide for one day’s service at a contract price of $600.
Defendant’s motion for summary judgment is granted in part and denied in part, and judgment is entered for plaintiff for $600.